Edward M. O'BRIEN, as Administrator c.t.a. of the Estate of Chester J. Barch, Deceased, Appellee,

v.

AVCO CORPORATION, the Bendix Corporation and Paul G. Badgley Company, Inc., Appellants.

Nos. 120, 121, Dockets 33576, 33577.

United States Court of Appeals Second Circuit.

Argued Oct. 8, 1969.

Decided Nov. 13, 1969.

See also D.C., 309 F.Supp. 703.

Ernest Kennedy, New York City (Mendes & Mount, New York City, on the brief), for appellants AVCO and Bendix.

William G. Becker, Jr., Newark, N. J. (Donald A. Robinson, New York City, on the brief), for appellant Paul G. Badgley Co. Inc.

Alfred W. Gans, New York City (Frank H. Granito, Jr., Speiser, Shumate, Geoghan, Krauss & Rheingold, New York City, on the brief), for appellee.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge.

■ The sole question for determination on appeal is whether appointment of an administrator c. t. a. of an estate for the purpose of invoking federal diversity jurisdiction is "improper" or "collusive" within the meaning of 28 U.S.C. § 1359 (1964).[1]

Since the dispute is over the law alone, the facts may be stated briefly. In 1965, Chester J. Barch, John T. Schweitzer, and Harry T. Ditch were passengers in a small plane owned by the Paul G. Badgley Company, Inc. of New York, flown by its president, Paul G. Badgley, from its hangar in Syracuse. En route to Cleveland, Ohio the plane crashed, killing all four men. Mrs. Barch, executrix of her husband's estate, in 1967 instituted a wrongful death action in New York County Supreme Court against the Badgley Company, AVCO Corporation (which maintained the plane), and the Bendix Corporation (maker of the allegedly faulty component). Later in the month, Mrs. Badgley and the Badgley Company brought suit in Onondaga County against AVCO, Bendix, and Mooney Aircraft, Inc., maker of the plane. The Ditch estate also instituted an action in Onondaga County (where all plaintiffs resided) against AVCO, Bendix, and Mooney. In June, the Schweitzer estate also filed suit in Onondaga County, but shortly before, the Badgley Company moved to try all the actions jointly in the Onondaga County Supreme Court.

The Barch attorneys, faced with the prospect of an upstate court, took evasive action. Mrs. Barch requested permission of the Onondaga County Surrogate's Court to resign as administratrix, and to have Edward M. O'Brien, a New Jersey resident and member of the law firm representing her in the instant action, appointed as administrator in her stead "for the limited purpose" as she phrased

1. " § 1359. Parties collusively joined or made

    A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

it in her application to the Surrogate, "of prosecution of the wrongful death action against the defendants."

The Surrogate granted the request in July, and O'Brien, on behalf of the estate, brought suit in the United States District Court for the Southern District of New York on the same claim. Subsequently, the Supreme Court of Onondaga County ordered all four actions to be tried jointly in Onondaga County. AVCO, Badgley, Bendix, and the Badgley, Ditch, and Schweitzer estates moved before the Onondaga Surrogate to vacate O'Brien's appointment, which he did on the basis of failure "to disclose material facts." On September 14, 1967, Judge McLean dismissed the federal action for lack of diversity jurisdiction, based on the vacatur of O'Brien's appointment. O'Brien, however, succeeded in having the Appellate Division of the state Supreme Court reverse the vacatur. In re Barch's Will, 30 A.D.2d 241, 291 N.Y.S.2d 422 (4th Dept. 1968), appeal dismissed, 23 N.Y.2d 865, 298 N.Y.S.2d 73, 245 N.E.2d 805 (1969). On February 20, 1969, Judge McLean granted O'Brien's motion to set aside his original order, and reinstated the action. We granted leave for an interlocutory appeal of that order on May 1, 1969 pursuant to 28 U.S.C. § 1292(b).

## I.

AVCO's basic contention is that the appointment of O'Brien for the sole purpose of invoking federal diversity jurisdiction constitutes "manufactured diversity" of the sort prohibited by 28 U.S.C. § 1359. O'Brien, in response, relies on Lang v. Elm City Construction Co., 324 F.2d 235 (2d Cir. 1963), which permitted manufactured diversity when fiduciaries, such as administrators, were involved. See also Stephan v. Marlin Firearms Co., 325 F.2d 238 (2d Cir. 1963) (aff'd per curiam on the basis of Lang), cert. denied 384 U.S. 959, 86 S.Ct. 1584, 16 L.Ed.2d 672 (1966).

■ It seems well settled that for purposes of diversity jurisdiction the citizenship of the fiduciary, and not the beneficiary, usually controls. See Rice

v. Houston, 80 U.S. (13 Wall.) 66, 21 L.Ed. 484 (1871); Dodge v. Tulleys, 144 U.S. 451, 12 S.Ct. 728, 36 L.Ed. 501 (1892); Mexican Central Railway v. Eckman, 187 U.S. 429, 23 S.Ct. 211, 47 L.Ed. 245 (1903); McSparren v. Weist, 402 F.2d 867, 869 (3d Cir. 1968), cert. denied sub nom. Fritzinger v. Weist, 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969). "Manufactured" diversity, however, raises rather more serious problems. This requires us to scrutinize carefully the policy expressed in section 1359, a policy as old as the federal courts themselves. Section 11 of the Judiciary Act of 1789, 1 Stat. 78, provided that District Courts and Circuit Courts should not have

> "cognizance of any suit to recover the contents of any promissory note or other chose in action in favour of an assignee, unless a suit might have been prosecuted in such court to recover the said contents if no assignment had been made  *  *  *."

Something less than a hundred years later the section was amended, but to the end of broadening its prohibitions to "promissory notes negotiable by the law merchant and bills of exchange." Act of March 3, 1875, § 1, c. 137, 18 Stat. 470. Section 5 of the same Act, however, added what may be regarded as the direct predecessor of Section 1359:

> "  *  *  *  if in any suit commenced in a circuit court [which then had original diversity jurisdiction]  *  *  it shall appear to the satisfaction of said circuit court, at any time after such suit has been brought  *  *  *  that such suit does not really and substantially involve a dispute or controversy properly within the jurisdiction of said circuit court, or that the parties to said suit have been improperly or collusively made or joined,  *  *  for the purpose of creating a case cognizable  *  *  *  under this act; the said circuit court  *  *  *  shall dismiss the suit  *  *  *."

See Williams v. Nottawa, 104 U.S. 209, 26 L.Ed. 719 (1881).

With changes in language, the restrictive assignee clause in the 1789 Act remained until 1948, as did the provisions of the 1875 Act. As a part of the revision of the Judicial Code in 1948, the assignee clause was dropped, and a revision of the 1875 section adopted, in the belief that by seeking to "prevent the manufacture of jurisdiction" in a direct manner, some of the abstruse distinctions that had grown up could be avoided. Act of June 25, 1948, c. 646, 62 Stat. 935. See Reviser's Note to 28 U.S.C. § 1359; C. Wright, Federal Courts 85 (1963).

## II.

The historical rationale for diversity jurisdiction was that out-of-state parties might be subjected to undue prejudice in state courts, and thus ought to be afforded the opportunity to have their cases tried in an impartial forum. See Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 87, 3 L.Ed. 38 (1809) (Marshall, C. J.). The continued validity of Marshall's argument, in a mobile and urban society has been questioned by scholars. Several, however, still agree that the danger of prejudice—or merely the fear of it—remains the chief underlying support for diversity jurisdiction.[2]

Even under that rationale, however, there can be no excuse for engulfing the already over-burdened federal courts with cases involving controversies between citizens of the same state, who seek to invoke federal jurisdiction through sham transactions. Section 1359 is merely the last of a series of enactments embodying that clear and salutary principle.

## III.

Despite the clear purpose of the amendment, some courts have continued to pay scant heed to its command, leading a commentator to remark, as late as 1963, that the section was "largely ineffective." C. Wright, Federal Courts 86 (1963). The principal reasons for this ineffectiveness were decisions holding that administrators, guardians, and the like, appointed expressly to confer jurisdiction, were effective to create diversity. Some of the cases are of ancient vintage; others more recent. See, e. g., Goff's Adm'r v. Norfolk & W. R.R., Co., 36 F. 299 (Cir.Ct. W.D.Va. 1888); Jaffe v. Philadelphia & Western R.R., Co., 180 F.2d 1010 (3d Cir. 1950); Corabi v. Auto Racing, Inc., 264 F.2d 784, 75 A. L.R.2d 711 (3d Cir. 1959).

In this Circuit the leading case is Lang v. Elm City Construction Co., 324 F.2d 235 (1963). See also Stephan v. Marlin Firearms Co., 325 F.2d 238 (2d Cir. 1963) (per curiam), cert. denied 384 U.S. 959, 86 S.Ct. 1584, 16 L.Ed.2d 672 (1966). Lang was a one paragraph per curiam opinion, without any rationale beyond a citation to Corabi. Corabi, then, becomes crucial. That case rested on two grounds. The first was that the result was controlled by Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 276 U.S. 518, 524–525, 48 S.Ct. 404, 72 L.Ed. 681 (1928) (Holmes, Brandeis, and Stone, JJ. dissenting), which held that if there were an "actual" transfer, then the assignment was not collusive regardless of the motive. The result would clearly be otherwise, where the transfer was solely for the purpose of collection. See Lehigh Mining & Manufacturing Co. v. Kelly, 160 U.S. 327, 16 S.Ct. 307, 40 L.Ed. 444 (1895); Miller & Lux v. East Side Canal & Irrigation Co., 211 U.S. 293, 29 S.Ct. 111, 53 L.Ed. 189 (1908); Kramer v. Caribbean Mills, Inc., 394

---

2. Compare Friendly, The Historic Basis of Diversity Jurisdiction, 41 Harv.L.Rev. 483 (1928) and Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216 (1948) with Parker, Dual Sovereignty and the Federal Courts, 51 Nw.U.L.Rev. 407 (1956) and Ynetma, The Jurisdiction of the Federal Courts in Controversies Between Citizens of Different States, 19 A.B.A.J. 71 (1933). See also American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 458–64 (1969) (adopted May 18, 1965, and May 21, 22, 1968) (Appendix A).

U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969). *Black & White Taxicab* has been "the target of universal condemnation, as the worst example of the abuses of diversity possible under the rule of Swift v. Tyson," C. Wright at 86–87 n. 17, and doubt has been cast on its continuing validity. See American Law Institute, *supra* note 2, at 159. See also *Kramer*, 394 U.S. at 828 n. 9, 89 S.Ct. 1487. The appointment of an administrator *ad litem*, whose sole function is to collect the proceeds of a lawsuit and turn them over to the beneficiary, is far more akin to the "collection" than the "actual transfer" line of cases, and it is difficult to justify *Corabi* even on the basis of *Black & White Taxicab.*

*Corabi* also suggested that the dictionary meaning of "collusive" tended to show that Section 1359 prohibited only secret agreements. The purpose of Section 1359, however, was to prevent agreements whose primary aim was to vest the court with a jurisdiction it had not formerly enjoyed. The dictionary meaning seems hardly helpful here. Indeed, it appears positively misleading, for both secret and open agreements share the same vice: they confer jurisdiction not justified by aims of diversity. See *Kramer*, 394 U.S. at 828, 89 S.Ct. 1487, holding an assignment "collusive" under § 1359, although it was open, and its stated purpose was to confer jurisdiction. Another argument urged for invoking federal jurisdiction and central to the *Jaffe* decision and others involving court-appointed fiduciaries, is that once there has been a state appointment, questioning its validity in a federal court constitutes a forbidden collateral attack. The argument calls to mind Chief Justice White's well known dictum: "To state the proposition is to refute it." Employers' Liability Cases, 207 U.S. 463, 502, 28 S.Ct. 141, 147, 52 L.Ed. 297 (1908). While a state may of course define and encourage certain fiduciary relationships, the characterization and effect of those relationships for the purposes of federal diversity jurisdiction is a federal question. Kramer v. Caribbean

Mills, Inc., 394 U.S. 823, 829, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969); Missouri P.R. Co. v. Fitzgerald, 160 U.S. 556, 582, 16 S.Ct. 389, 40 L.Ed. 536 (1896). Accordingly, the legality of a relationship for state law purposes does not control its effect on federal jurisdiction. That effect is determined by the policies behind the general grant of diversity jurisdiction, and its limitation in section 1359.

## IV.

Several recent decisions have approved the application of section 1359 to efforts to manufacture diversity by appointment of a fiduciary. We note that it is not of little significance that the Third Circuit, sitting *en banc*, in McSparren v. Weist, 402 F.2d 867 (1968), cert. denied, sub nom. Fritzinger v. Weist, 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969), expressly overruled *Corabi*, on which our *Lang per curiam* decision squarely rested. See also Esposito v. Emery, 402 F.2d 878 (3d Cir. 1968). ever appointment of a fiduciary was McSparren clearly instructed that when merely a "naked arrangement" to confer jurisdiction on the federal courts, section 1359 would bar a suit by the administrator. On closely similar facts, the Fourth Circuit recently decided that appointment of an out-of-state administrator solely for the purpose of invoking a federal forum in which to try a wrongful death action was ineffective to create diversity. Lester v. McFaddon, Docket No. 12,875, 415 F.2d 1101 (4th Cir. Sept. 15, 1969).

For eight years the American Law Institute has been engaged in a study of jurisdiction between state and federal courts, under the distinguished leadership of Richard H. Field, Professor of Law, Harvard Law School, a noted authority on matters of federal procedure. In 1968 the Institute approved the final version of its recommendations for a complete overhaul of federal jurisdictional statutes. All statutes involving diversity jurisdiction were renumbered and grouped into proposed sections 1301 to

1307. Proposed section 1301(b) (4) would establish the citizenship of the decedent or incompetent, and not his executor, administrator, or guardian, as controlling for diversity purposes.[3] Proposed section 1307, a redraft of the present 1359, would divest the district court of diversity jurisdiction whenever "an object" of a transfer was to invoke diversity jurisdiction.[4] "Transfer" is specifically defined to include appointment of a fiduciary, whether by court or private action.

The aim of these proposed revisions, like those of the present section 1359, is to restrict federal diversity jurisdiction to those cases in which there exist the conditions that justify it. While we do not deem it wise to create by judicial legislation the equivalent of the American Law Institute proposals, we feel the recommendations approved by such a distinguished group of scholars to be strong evidence of the type of abuse at which the present section 1359 was directed. The most recent Supreme Court pronouncement on section 1359 supports this position. The *Kramer* case, although expressly reserving the question of fiduciaries appointed to confer jurisdiction, clearly decided that an assignment for the purpose of invoking federal jurisdiction, where the assignor retains a substantial interest in the outcome, violated section 1359. *Kramer* suggested three possible reasons for distinguishing administrators and guardians from assignees. 394 U.S. at 828 n. 9, 89 S.Ct. 1487. The first was that while the assignor himself could ordinarily sue in a state court, frequently the beneficiary could not. As a general proposition, we see no policy in diversity jurisdiction that is furthered by granting beneficiaries preferential treatment over those with capacity to sue; that some appointment is needed for one and not the other seems insufficient to support federal jurisdiction. In the case at bar—and in *Lester*—the collusiveness is made more apparent, since in both instances an out-of-state administrator was appointed to *replace* a resident administrator.

The second possible ground of distinction suggested is that administrators may possess "discrete powers" under state law. While that may be true, applying section 1359 will not frustrate any legitimate state interest in endowing fiduciaries with wide powers; it

3. American Law Institute, *supra* note 2, at 10–11:
"§ 1301. *General Diversity of citizenship jurisdiction; amount in controversy; costs*
\*　\*　\*　\*　\*　\*
(b) For the purposes of this section and section 1302 [exceptions to diversity] of this title:
\*　\*　\*　\*　\*　\*
(4) An executor, or an administrator, or any person representing the estate of a decedent or appointed pursuant to statute with authority to bring an action because of the death of a decedent shall be deemed to be a citizen only of the same State as the decedent; and a guardian, committee, or other like representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the person represented."

4. *Id.* at 22–23:
"§ 1307. *Parties joined or made with a purpose of invoking or defeating federal jurisdiction*
(a) A district shall not have jurisdiction of a civil action in which any party has been made or joined improperly, or collusively, or pursuant to agreement or understanding between opposing parties, in order to invoke the jurisdiction of such court.
(b) Whenever an object of a sale, assignment, or other transfer of the whole or any part of an interest in a claim or any other property has been to enable or to prevent the invoking of federal jurisdiction under this chapter or chapter 158 of this title, jurisdiction of a civil action shall be determined as if such sale, assignment, or other transfer had not occurred. The word 'transfer' as used in this section includes the appointment of a trustee, receiver, or other fiduciary, or any other person to hold or receive interests of any kind, whether made by private persons or by a court or any other official body."

will simply render their citizenship a neutral factor for federal purposes.

A last ground suggested is that such representatives are generally appointed by a state court, and not by private agreement. Justice Harlan could not have meant that the state court decision is immune from collateral attack; he pointedly said that citizenship for diversity purposes is a federal question. 394 U.S. at 829, 89 S.Ct. 1487. If, on the other hand, his statement is construed as meaning that the state courts might be acting independently for purposes other than manufacturing diversity, state court opinions seem to express precisely the contrary principle. In approving the resignation of Mrs. Barch, and in reinstating the appointment of O'Brien in this case, the Appellate Division of the New York Supreme Court, Fourth Department, remarked, "It would appear to us that the discretion of the Surrogate would virtually dictate permitting the resignation, for the sole purpose, as communicated to him, was concededly the desire to secure a larger recovery in the Federal court." 30 A.D.2d 241, 291 N.Y.S.2d 422, 428 (1968), appeal dismissed, 23 N.Y.2d 865, 298 N.Y.S.2d 73, 245 N.E.2d 805 (1969). See also Jamison v. Kammerer, 264 F.2d 789 (3d Cir. 1959) (indicating that plaintiff administrator had served in the same role in the court below 33 other times to create diversity). The significance of a court order appointing an administrator or guardian seems severely undercut by precedents such as these, as well as by the American Law Institute proposals.

## V.

We are unable, therefore, to find any basis for distinguishing the appointment of an administrator in the instant case from the assignment involved in *Kramer*. We regard the decision in *Kramer* as impliedly overruling the grounds on which our *Lang* decision was based. Moreover, we believe that the Third Circuit's explicit overruling of *Corabi*—on which *Lang* rested—further vitiates our *Lang* decision. We thus no longer consider *Lang* binding, and hold that appointment of an administrator for the purpose of obtaining federal jurisdiction violates section 1359.

Plaintiffs have a viable action pending in the state courts, and will suffer no hardship other than loss of the federal forum they did not deserve.[5] O'Brien's claim that he will be prejudiced in the state court because the action will have more restricted discovery, a joint trial, and a likelihood of a lower monetary recovery strikes us as a blatant example of precisely the type of forum-shopping that section 1359 and cases like Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) were designed to prevent. As the American Law Institute study concluded, "There is no proper place in the federal courts for cases in which diversity has thus been deliberately created in order to obtain a federal forum for what would otherwise be a purely local lawsuit betwen co-citizens." See American Law Institute, *supra* note 2, at 118.

We agree, and accordingly reverse the order of the District Court and direct dismissal of the action.

---

5. We note also that New York Civil Practice Laws and Rules § 205 (McKinney 1963), permits actions dismissed other than on the merits to be recommenced within six months, even if the statute of limitations applicable to the cause has expired. This section applies to actions dismissed in the federal courts in New York. Park & Pollard Co. v. Industrial Fire Ins. Co., 197 A.D. 671, 189 N.Y.S. 866 (1927).

We do not decide whether a court in the exercise of its equitable jurisdiction might entertain an action already pending when dismissal, because of the applicable statute of limitations, would bar further prosecution in the state courts. See Lester v. McFaddon, Docket No. 12,875, 415 F.2d 1101 (4th Cir. Sept. 15, 1969); McSparren v. Weist, 402 F.2d 867 (3d Cir. 1968), cert. denied sub nom. Fritzinger v. Weist, 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969).